[No. E015215. Fourth Dist., Div. Two. Mar. 15, 1996.]

THE PEOPLE, Plaintiff and Respondent, v.
KEITH BARNARD BELL, Defendant and Appellant.

**[Opinion certified for partial publication.\*]**

---

*Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of parts III, V and VI.

## COUNSEL

Brett Harding Duxbury, under appointment by the Court of Appeal, for Defendant and Appellant.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, Gary W. Schons, Assistant Attorney General, M. Howard Wayne and Gary W. Brozio, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**RICHLI, J.**—A "K-9" officer stopped the car in which defendant was the passenger for speeding. The officer talked to the driver while writing a ticket, then talked separately to defendant. Because he suspected they were transporting drugs, he asked both men for consent to search; defendant agreed that the officer could search his baggage, which was in the trunk. The officer directed his drug-sniffing dog, Rycon, to sniff the trunk. However, Rycon turned up his nose, so to speak, at the trunk; instead, he trotted to the

passenger-side door, which defendant had left open, and alerted to the area under defendant's seat. There the officer found a package of cocaine.

After defendant's motion to suppress (Pen. Code, § 1538.5) was denied, he pleaded guilty to possession of cocaine for sale (Health & Saf. Code, § 11351). In this appeal, he contends:

1.  The driver was unlawfully detained for questioning unrelated to the purposes of the traffic stop; hence, defendant was unlawfully detained at the same time.

2.  After the driver was issued a ticket, defendant was unlawfully detained for additional questioning unrelated to the purposes of the traffic stop.

3.  The canine sniff search exceeded the scope of defendant's consent to search.

4.  The canine sniff search constituted an unlawful search of the interior of the car without probable cause.

We hold that the trial court properly denied defendant's motion to suppress. Defendant is entitled to challenge the driver's detention because he and the driver were both detained at the same time, but the officer's questioning did not unlawfully prolong the driver's detention. As a result of that questioning, the officer had sufficient reasonable suspicion to detain defendant briefly for further questioning. The canine sniff search did not exceed the scope of defendant's consent, and, while the dog was still outside the car, the sniff search revealed probable cause to search the car interior. Accordingly, we will affirm.

I

FACTUAL BACKGROUND

On Saturday, March 12, 1994, California Highway Patrol Officer Joseph David was on routine patrol on Interstate 40, near Needles. Interstate 40 is "a major pipeline used by drug traffickers." Officer David's patrol car was marked "K-9"; in it with him was his trained drug-sniffing dog, Rycon.

About 6:40 a.m., Officer David saw a car going 75 to 80 miles per hour in the opposite direction. He made a U-turn across the center divider, then overtook the car; he clocked it going over 75 miles per hour. The car took the J Street offramp. Officer David followed it and turned on his flashing lights.

The car pulled into a gas station and up to the gas pumps. Officer David pulled in behind it. He ordered the driver of the car, Darryl Stewart, to move it to the side of the gas station; Stewart complied, then came back to the patrol car. Stewart displayed an Alabama driver's license. His hands were trembling and he avoided eye contact. Officer David told Stewart why he had stopped the car, then asked Stewart for the registration. Stewart produced a car rental contract.

Officer David began writing a speeding ticket; while he wrote, he "engage[d] in conversation" with Stewart. Stewart said he and his passenger had come from Alabama to attend a car auction in Del Mar. He said they had left Alabama on Sunday (March 6) and arrived in California on Monday (March 7). They had spent two nights in Del Mar, the next two nights with Stewart's girlfriend in Los Angeles, and the fifth night at a motel. The rental contract, however, indicated that the car had been rented on March 10, and was due to be returned in Alabama March 12, that same day.

Officer David gave Stewart the ticket, along with his license and rental contract, then said, "[W]ait here." He walked over to the car, where defendant, the passenger, was sitting. He advised defendant that California law required him to wear a seat belt. Officer David had already noticed that defendant was not wearing a seat belt; however, defendant could have taken it off after pulling in to the gas station. Officer David asked to see defendant's identification. Defendant produced his driver's license; his hands, too, were shaking, and he, too, avoided eye contact.

Officer David asked defendant where he was coming from and where he was going. Defendant said he and Stewart had arrived in California on Thursday (March 10) to attend a car auction in Riverside. Officer David noticed some scars on defendant's leg, and asked if they were bullet holes. Defendant denied this, and said he had been "stuck by something." Officer David also noticed a cellular phone in the car.

At this point, Officer David suspected that the men were transporting drugs. His suspicion was based on: (1) their nervousness, (2) the discrepancies between Stewart's story and the rental agreement, (3) the discrepancies between Stewart's story and defendant's story, (4) the evidence that the car had been rented for "a shot out to Los Angeles to spend one night and come back," which made it unlikely that they had come just to attend a car auction, (5) the cellular phone, and (6) the apparent bullet marks on defendant's leg.

Officer David went back to Stewart, confirmed his story, and wrote down his responses. Then he went back to defendant again, asked him the same

questions, and wrote down his responses. He radioed for a backup officer. He asked Stewart if he had any cocaine in his car; Stewart said no. He asked Stewart if he could search the car. At first, Stewart said yes. Officer David filled out a written consent form; as he was explaining it to Stewart, Stewart changed his mind and withdrew his consent. Meanwhile, the backup officer arrived.

Officer David went back to defendant and asked if they had any cocaine in the car. Defendant said no. Officer David asked if he could search the car; defendant responded, "Just my stuff." He said he had a bag and briefcase in the trunk. Officer David asked him to open the trunk. Defendant took the keys out of the ignition, got out of the car (leaving his door open), and opened the trunk; he "was shaking so hard he almost couldn't get the keys into the trunk."

The backup officer told defendant to move about 20 feet away from the car. Officer David got Rycon out of the patrol car and directed him to sniff the trunk. Rycon put his front paws up on the trunk, but immediately got down again and went to the open passenger door. He alerted to the area under the passenger seat by placing his head and one foot under the seat. Officer David looked under the seat and found a package of cocaine.

## II

### THE DETENTION OF STEWART

The trial court found that both Stewart and defendant were lawfully detained, and specifically found that their detention was not unlawfully prolonged. Defendant challenges this finding, first with respect to Stewart. He contends that Stewart's detention became unlawful because Officer David questioned him about matters unrelated to issuance of a speeding ticket. The People respond that defendant lacks standing to challenge Stewart's detention. They maintain that while Stewart was questioned, defendant was free to leave; they characterize Officer David's initial contact with defendant as consensual.

### A. *Defendant's Standing to Challenge Stewart's Detention.*

▆ An ordinary traffic stop is treated as an investigatory detention, i.e., a *"Terry* stop." (*United States* v. *Sharpe* (1985) 470 U.S. 675, 682 [84 L.Ed.2d 605, 613, 105 S.Ct. 1568]; *Berkemer* v. *McCarty* (1984) 468 U.S. 420, 439 [82 L.Ed.2d 317, 334, 104 S.Ct. 3138]; see generally, *Terry* v. *Ohio* (1968) 392 U.S. 1 [20 L.Ed.2d 889, 88 S.Ct. 1868].) "Under this approach,

we examine 'whether the officer's action was justified at its inception, and whether it was reasonably related in scope to the circumstances which justified the interference in the first place.' " (*United States* v. *Sharpe, supra*, 470 U.S. at p. 682 [84 L.Ed.2d at p. 613], quoting *Terry* v. *Ohio, supra*, 392 U.S. at p. 20 [20 L.Ed.2d at p. 905].) A traffic stop is justified at its inception if based on at least reasonable suspicion that the driver has violated the Vehicle Code or some other law. (*People* v. *Miranda* (1993) 17 Cal.App.4th 917, 926 [21 Cal.Rptr.2d 785].) However, it "must be temporary and last no longer than is necessary to effectuate the purpose of the stop." (*Florida* v. *Royer* (1983) 460 U.S. 491, 500 [75 L.Ed.2d 229, 238, 103 S.Ct. 1319] (plur. opn.).)[1]

Under the Fourth Amendment, a person is detained if a reasonable person in the same position would not feel free to leave. (*In re James D.* (1987) 43 Cal.3d 903, 912-913 [92 Cal.Rptr. 301, 479 P.2d 661], cert. den. *sub nom. James D.* v. *California* (1988) 485 U.S. 959 [99 L.Ed.2d 422, 108 S.Ct. 1222]; *Florida* v. *Royer, supra*, 460 U.S. at pp. 501-502 [75 L.Ed.2d at pp. 238-239].) The United States Supreme Court has strongly hinted, although never held, that a traffic stop of a vehicle constitutes a detention of *all* its occupants, including passengers. (*Berkemer* v. *McCarty, supra*, 468 U.S. at p. 436 [82 L.Ed.2d at p. 332] [traffic stop "significantly curtails the 'freedom of action' of the driver and the passengers, if any, of the detained vehicle"]; *Colorado* v. *Bannister* (1980) 449 U.S. 1, 4, fn. 3 [66 L.Ed.2d 1, 4, 101 S.Ct. 42] ["There can be no question that the stopping of a vehicle and the detention of its occupants constitute a 'seizure' within the meaning of the Fourth Amendment."]; *Delaware* v. *Prouse* (1979) 440 U.S. 648, 653 [59 L.Ed.2d 660, 667, 99 S.Ct. 1391] ["stopping an automobile and detaining its occupants constitutes a 'seizure' . . . ."].)

Most federal courts have held that a traffic stop of a vehicle constitutes a detention of any passengers. A passenger therefore has standing to challenge the detention. If, however, the detention is permissible as to the driver—for example, if it is based on reasonable suspicion that the driver has violated the Vehicle Code—then the detention is likewise permissible as to the passenger. (*U.S.* v. *Kimball* (1st Cir. 1994) 25 F.3d 1, 5; *U.S.* v. *Roberson*

---

[1]The *Florida* v. *Royer* plurality opinion added that ". . . the investigative methods employed should be the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time." (460 U.S. at p. 500 [75 L.Ed.2d at p. 238].) The Supreme Court, however, has since repudiated any "least intrusive means" test for commencing or conducting an investigatory stop. (*United States* v. *Sokolow* (1989) 490 U.S. 1, 10-11 [104 L.Ed.2d 1, 12-13, 109 S.Ct. 1581]; *United States* v. *Sharpe, supra*, 470 U.S. at pp. 686-687 [84 L.Ed.2d at pp. 615-616].) "The question is not simply whether some other alternative was available, but whether the police acted unreasonably in failing to recognize or to pursue it." (*United States* v. *Sharpe, supra*, 470 U.S. at p. 687 [84 L.Ed.2d at p. 616].)

(5th Cir. 1993) 6 F.3d 1088, 1091, cert. den. 510 U.S. 1182 [127 L.Ed.2d 574, 114 S.Ct. 1230], 510 U.S. 1204 [127 L.Ed.2d 671, 114 S.Ct. 1322], __ U.S. __ [128 L.Ed.2d 58, 114 S.Ct. 1383]; *U.S.* v. *Rusher* (4th Cir.1992) 966 F.2d 868, 874, fn. 4, 875, cert. den. 506 U.S. 926 [121 L.Ed.2d 266, 113 S.Ct. 351]; *U.S.* v. *Powell* (7th Cir. 1991) 929 F.2d 1190, 1195, cert. den. 502 U.S. 981 [116 L.Ed.2d 609, 112 S.Ct. 584]; *U.S.* v. *Erwin* (10th Cir. 1989) 875 F.2d 268, 270; *U.S.* v. *Portwood* (8th Cir. 1988) 857 F.2d 1221, 1222, cert. den. 490 U.S. 1069 [104 L.Ed.2d 638, 109 S.Ct. 2073], disapproved on other grounds in *Taylor* v. *United States* (1990) 495 U.S. 575 [109 L.Ed.2d 607, 110 S.Ct. 2143].)

Most California cases are consistent with this approach. For example, in *In re William J.* (1985) 171 Cal.App.3d 72 [217 Cal.Rptr. 163], a police officer stopped the car the defendant was driving because there was an outstanding arrest warrant for the passenger. When the stop revealed that the defendant was in possession of a billy club, the officer arrested the defendant, too. (*Id.*, at p. 75.) On appeal, the defendant argued that he was detained unlawfully because there was no reasonable suspicion that he, as opposed to his passenger, was involved in criminal activity. The court apparently agreed that the defendant was detained, but it upheld his detention because there were grounds to detain his passenger. (*Id.*, at pp. 75-77.) Otherwise, "legions of criminals throughout the land could hire drivers, who are upstanding citizens with no past criminal involvement, to chauffeur them around our streets and highways in open, notorious view. As smug passengers they could wave to the police who could only watch in frustration as they passed by. A momentary stop of an automobile by police to investigate a passenger reasonably believed to be involved in a past crime is proper. It creates a minimal inconvenience to the driver of that automobile, when balanced against the government's interest in apprehending criminals." (*Id.*, at p. 77.)

Next, in *People* v. *Lionberger* (1986) 185 Cal.App.3d Supp. 1 [230 Cal.Rptr. 358], a police officer stopped the car in which the defendants were passengers; the trial court eventually held that the stop was made without sufficient cause. The officer checked the passengers' eyes to see whether their pupils were dilated; when he found that they were, he arrested the passengers for using a controlled substance. (*Id.*, at pp. Supp. 2-4.) The trial court ruled that the passengers lacked standing to challenge the stop. (*Id.*, at p. Supp. 3.)

The appellate department disagreed. It held that whether the passengers had standing turned on whether their own Fourth Amendment rights had been violated. (185 Cal.App.3d at p. Supp. 4.) It concluded that the passengers had been detained and could therefore challenge the stop. It relied on

numerous cases from other states, such as *State* v. *Eis* (Iowa 1984) 348 N.W.2d 224, 226, which it quoted with approval: " 'No principled basis exists for distinguishing between the privacy rights of passengers and drivers in a moving vehicle. When the vehicle is stopped they are equally seized; their freedom of movement is equally affected. We therefore hold that occupants of motor vehicles, whether drivers or passengers, ordinarily have a legitimate expectation of privacy which is invaded when the vehicle is stopped by the government.' " (185 Cal.App.3d at p. Supp. 5.)

Curiously, however, the court went on to consider whether the officer's contact with the passengers was a consensual encounter or a detention (185 Cal.App.3d at p. Supp. 5)—a question one would think it had just answered. It held that it was a detention because the officer not only stopped the car, but also demanded to see the passengers' eyes.

Finally, in *People* v. *Grant* (1990) 217 Cal.App.3d 1451 [266 Cal.Rptr. 587], a police officer stopped the car in which the defendant was a passenger, for speeding. The driver had no identification. The officer then asked the defendant for his identification. When the defendant likewise had none, the officer told both the driver and the defendant to get out and to stand by the patrol car. He asked the defendant if he could search the car for identification; the defendant agreed. The officer found drugs. (*Id.,* at pp. 1455-1456.)

On appeal, the defendant claimed he was unlawfully detained when he consented to the search. (217 Cal.App.3d at p. 1456.) He argued, among other things, that he could not be detained in the absence of reasonable suspicion that he, as opposed to the driver, was involved in criminal activity. (*Id.,* at p. 1460.) The court disagreed, stating: "We believe the United States Supreme Court answered this question in *Prouse* by characterizing a traffic stop as a 'seizure' of the automobile's 'occupants.' [Citation.] Defendant on the one hand characterizes the contact as a 'seizure' of his 'person' as an occupant of a lawfully stopped vehicle under *Delaware* v. *Prouse,* and at the same time argues that justification independent of the traffic stop is required to detain him. He cannot have it both ways. We find, after a realistic assessment of the facts, that the stop and detention of defendant was merely incident to his being a passenger in a lawfully stopped vehicle. [Citation.] Therefore, if the stop of the vehicle and its operator was lawful, which we think it was, there was a lawful basis to stop and detain defendant." (*Id.,* at p. 1460.) It concluded that: "The 'seizure' of the occupants of the vehicle was a reasonable one. Defendant was detained only for the period necessary to perform the functions arising from the violation." (*Ibid.*; see also *People* v. *Hunt* (1990) 225 Cal.App.3d 498, 505 [225 Cal.Rptr.367] ["Because the

vehicle in which defendant [the passenger] was riding was lawfully stopped defendant was lawfully stopped," citing *Grant*.].)

However, the *Grant* court went on to state: "[W]e see no need to characterize the nature of the officer/passenger contact *where it does not go beyond the legitimate law enforcement practices incidental to the traffic stop*. If we assess the nature of defendant's encounter with Officer Soliz, *independent of the stop*, . . . we conclude that no separate 'detention' of defendant occurred. At most, we find the encounter a consensual one." (217 Cal.App.3d at pp. 1460-1461, italics added.)

In sum, *William J.* assumed, but never actually held, that the defendant had been detained. *Lionberger* and *Grant* seemed to hold that a traffic stop results in the detention of a passenger, although the detention is nevertheless permissible based on reasonable suspicion to stop the driver. Each, however, contained language suggesting that after the initial stop, the officer's encounter with the passenger was somehow consensual.

· This brings us to *People* v. *Gonzalez* (1992) 7 Cal.App.4th 381 [8 Cal.Rptr.2d 640]. There two police officers stopped the car in which the defendant was a passenger, based on the driver's failure to signal a lane change. The defendant started to get out of the car; an officer ordered him to get back in. The officer then approached the defendant and realized that he was under the influence of heroin. This led to his conviction for possession and transportation of heroin and cocaine. (*Id.*, at p. 383.)

The defendant argued that "he was unlawfully detained when the officer ordered him back into the car . . . ." (7 Cal.App.4th at p. 383.) The People responded that ". . . an officer conducting a lawful vehicle stop may request that the passenger remain in the car for officer safety reasons without separate probable cause to detain the passenger." (*Id.*, at p. 384.) The court of appeal concluded that the traffic stop alone did not result in a detention of the defendant. (*Ibid.*) It relied on the ambiguity in *Grant*: "[A]lthough the court said that the passenger had been 'detained,' the opinion is grounded on the premise that the passenger was free to withdraw from this consensual encounter with the officer." (*Ibid.*) It then held that the order to get back into the car *did* result in the detention of the passenger, and that this detention was not supported by a reasonable suspicion that the passenger was engaged in criminal activity. (*Id.*, at pp. 385-386.)

Reluctantly, we must disagree with *Gonzalez*.[2] We believe the better and clearer approach is to recognize that, as *Lionberger* and *Grant* suggest, and as the vast majority of state and federal courts have held, the typical traffic stop *does* result in the detention of any passenger in the vehicle.[3] However, the passenger's detention may be based on a reasonable suspicion of criminal activity by the driver or another passenger. Issues regarding the scope of the detention after the initial stop, whether raised by the driver or the passenger, should be analyzed identically. That is, as we will discuss in part B, *post*, the issue becomes whether, under *Terry* v. *Ohio*, *supra*, the officer's conduct is reasonably related to the circumstances of the initial traffic stop.

■ Accordingly, the detention of Stewart was equally a detention of defendant. If Stewart's detention was unlawfully prolonged, defendant's detention likewise was unlawfully prolonged. Defendant therefore has standing to challenge the scope of Stewart's detention, to which we now turn.

B. *The Scope of Stewart's Detention.*

The leading California case concerning the permissible scope of a traffic stop is *People* v. *McGaughran* (1979) 25 Cal.3d 577 [159 Cal.Rptr. 191, 601 P.2d 207]. There, a police officer stopped a car going the wrong way on a one-way street. After explaining why he had stopped the car, and after obtaining and examining identification from the defendant, who was driving, and from his passenger, the officer initiated a warrant check. The warrant check revealed arrest warrants for both men; searches incident to their arrests turned up evidence eventually used to convict the defendant of burglary. (*Id.*, at pp. 581-582.)

The Supreme Court held that ". . . the officer may temporarily detain the offender at the scene for the period of time necessary to discharge the duties that he incurs by virtue of the traffic stop." (25 Cal.3d at p. 584.) For example, the officer could ask for and examine the offender's driver's license and registration; discuss the violation with the offender; listen to his

---

[2]We also disagree with the recent case of *People* v. *Fisher* (1995) 38 Cal.App.4th 338 [45 Cal.Rptr.2d 57], which stated: "[W]e believe that in constitutional terms a passenger is not 'lawfully stopped' (contra, *People* v. *Hunt* (1990) 225 Cal.App.3d 498, 505 [275 Cal.Rptr. 367]), seized, or detained (contra, *People* v. *Grant* (1990) 217 Cal.App.3d 1451, 1460 [266 Cal.Rptr. 587]) merely because the vehicle in which he or she is riding is stopped for a traffic violation." (38 Cal.App.4th at p. 344.) Because *Fisher* provides no analysis, cites no supporting authority, ignores relevant state and federal cases, and recognizes that existing California cases are "contra," we do not feel constrained to follow it.

[3]Like any seeming bright-line rule in this area, this is subject to the caveat that every search and seizure case turns on its own unique facts. There might be a particular traffic stop in which the totality of the circumstances would require the conclusion that the passenger was not detained. Thus, we limit our holding to the typical traffic stop as featured in this case.

or her explanation; then either give the offender a warning, or write out a citation and obtain the offender's promise to appear. (*Ibid.*) "If a warrant check can be completed within that same period, no reason appears to hold it improper: because it would not add to the delay already lawfully experienced by the offender as a result of his violation, it would not represent any further intrusion on his rights." (*Ibid.*)

In the case before it, the court found that the officer had performed all these duties up to the point of giving the defendant a warning and releasing him. (25 Cal.3d at p. 585.) However, "[i]nstead of promptly releasing defendant and his companion with such a warning, [he] returned to his patrol car and detained them for an additional period while he placed a call over police radio to inquire whether there were outstanding warrants in either name, and waited for an answer to that call. It is undisputed that this second period of detention lasted 'approximately ten minutes.' " (*Id.*, at p. 586.) The "additional period of detention" was not "reasonably necessary" to the process of dealing with the initial offense, and hence was unconstitutional. (*Id.*, at p. 587.)

Similarly, in *Williams* v. *Superior Court* (1985) 168 Cal.App.3d 349 [213 Cal.Rptr. 919], a police officer followed a car in the hope of linking its occupants to a reported burglary. When the car ran a stop sign, he pulled it over. He asked the driver for his license and registration, then separated the driver and the occupant and talked to each of them about where they lived and what they were doing in the neighborhood. Finally, he asked the driver if he could search the car. The driver agreed. The search produced cocaine. (168 Cal.App.3d at pp. 354-356.)

The appellate court held that the detention could be justified if "the detention period was reasonably necessary for completion of the officer's duties relative to the traffic violation . . . ." (168 Cal.App.3d at p. 357.) The People argued that any detention lasting less than 10 minutes, as in *McGaughran*, would be reasonable, but the court disagreed: "The import of *McGaughran* is not the setting of a general outside time limit for minor traffic offense detentions. Implicit in the *McGaughran* analysis is a recognition that the circumstances of each traffic detention are unique and that the reasonableness of each detention period must be judged on its particular circumstances." (*Id.*, at p. 358.) "In our case, Officer Lowery promptly obtained all the information he needed to perform his citation duties but he elected not to complete the citation form in the normal course of events. Thus the officer's prolongation of the detention differs in detail but not in kind from the prolongation of the detention in *McGaughran*; the result— unnecessary extension of the traffic detention to investigate extraneous

matters—is identical." (*Id.*, at p. 359, see also *People* v. *Lusardi* (1991) 228 Cal.App.3d Supp. 1, 3-5 [280 Cal.Rptr. 80] [officer's request for consent to search car "unduly and illegally prolong[ed] a legitimate traffic stop"].)

*McGaughran* and *Williams* indicate that investigative activities beyond the original purpose of a traffic stop are permissible as long as they do not prolong the stop beyond the time it would otherwise take. Federal cases are generally in accord. (*U.S.* v. *Shabazz* (5th Cir. 1993) 993 F.2d 431, 435-437 [car stopped for speeding; officers could question driver about his travels and could request permission to search the car as long as they were still waiting for results of computer check on driver's license]; cf. *U.S.* v. *McSwain* (10th Cir. 1994) 29 F.3d 558, 561-562 [car stopped to check whether temporary registration sticker had expired; detention became unlawful when officer asked driver for license and registration and questioned him about his travel plans after he had already determined that sticker had not expired]; see also *U.S.* v. *Walker* (10th Cir. 1991) 933 F.2d 812, 814-816 and 816, fn. 2 [118 A.L.R.Fed. 781] [car stopped for speeding; detention became unlawful when officer questioned driver about weapons, drugs, and alcohol and requested consent to search while keeping his license and registration; result "might be different if the questioning by the officer did not delay the stop beyond the measure of time necessary to issue a citation."], cert. den. 502 U.S. 1093 [117 L.Ed.2d 414, 112 S.Ct. 1168].) Here, Officer David testified that his "conversation" with Stewart took place while he was writing the speeding ticket and did not add to the delay otherwise resulting from the traffic stop.

Defendant argues that the test is not solely one of duration but also of scope—that police cannot ask questions unrelated to the purpose of the traffic stop, regardless of whether those questions prolong the stop. The warrant check in *McGaughran*, however, was unrelated to the purpose of the traffic stop; nevertheless, the court held that a warrant check would be permissible as long as it did not prolong the stop. Similarly, *Williams*, although it rejected any fixed time limit, recognized that duration—"prolongation" or "unnecessary extension"—was central to the analysis. (168 Cal.App.3d at p. 359.)

The contention defendant makes here was considered and rejected in *U.S.* v. *Shabazz*, *supra*, 993 F.2d 431. There, two police officers stopped a speeding car. One of them asked the driver for his license. While he ran a computer check on it, he talked to the driver, who said he and his passenger had spent the past week in Houston. At the same time, the other officer talked to the passenger, who said they had been in Houston for two days. The officers asked for and obtained consent for a search of the car, which produced cocaine. (*Id.*, at pp. 433-434.)

On appeal, the defendants argued "that when the officers interrogated them about their visit to Houston, the detention exceeded the reasonable scope of the stop's original purpose . . . ." (993 F.2d at p. 435.) The appellate court, however, stated: "[W]e reject any notion that a police officer's questioning, even on a subject unrelated to the purpose of the stop, is itself a Fourth Amendment violation. . . . Mere questioning . . . is neither a search nor a seizure." (*Id.*, at p. 436.) It explained that the nature of the questioning during a detention might be relevant, but only as evidence of prolongation—"that the justification for the original detention no longer supports its continuation." (*Ibid.*)

"Here, appellants cannot successfully claim that the detention exceeded its original scope. . . . The questioning that took place occurred while the officers were waiting for the results of the computer check. Therefore, the questioning did nothing to extend the duration of the initial, valid seizure. Because the officers were still waiting for the computer check at the time that they received consent to search the car, the detention to that point continued to be supported by the facts that justified its initiation." (993 F.2d at p. 437.)

Even assuming, however, for the sake of argument, that police questioning about unrelated matters could taint an otherwise permissible traffic stop, we do not believe that occurred here. "The touchstone of the Fourth Amendment is reasonableness." (*Florida* v. *Jimeno* (1991) 500 U.S. 248, 250 [114 L.Ed.2d 297, 302, 111 S.Ct. 1801]; accord, *Ingersoll* v. *Palmer* (1987) 43 Cal.3d 1321, 1329 [241 Cal.Rptr. 42, 743 P.2d 1299].) Officer David's questions about where Stewart was coming from and what he had been doing were unintrusive and nonaccusatory. They were no more than conventional pleasantries, or small talk. As Officer David explained, "I think it would be a bad officer and bad public relations if I simply got out and asked for a driver's license and issued a citation without even trying to put the people at ease." We are loath to hold such efforts unconstitutional. We believe they are reasonably related to the purposes of a traffic stop.

We conclude that the scope of Stewart's detention, at least up to the point when Officer David issued him a speeding ticket and turned his attention to defendant, was lawful.

III

THE CONTINUED DETENTION OF DEFENDANT*

. . . . . . . . . . . . . . . . . . . . . . . . .

*See footnote, *ante*, page 754.

## IV

### THE SCOPE OF DEFENDANT'S CONSENT TO SEARCH

Defendant contends that the canine sniff search exceeded the scope of his consent to search. First, he contends that his consent was limited to his baggage, and did not extend to a search of the trunk. Second, he contends that his consent did not extend to the use of a drug-sniffing dog.[4] The People respond that a canine "sniff" is not a "search" at all, and that the search and/or "sniff" of the trunk is irrelevant because it "did not result in the s[ei]zure of contraband . . . ."

■ A "sniff" by a trained drug-sniffing dog in a public place is not a "search" within the meaning of the Fourth Amendment. (*United States* v. *Place* (1983) 462 U.S. 696, 707 [77 L.Ed.2d 110, 120-121, 103 S.Ct. 2637].) This is because a canine sniff search "is much less intrusive than a typical search": it does not require opening closed containers and exposing any of their noncontraband contents; it reveals only the presence of contraband. (*Ibid.*)

The Supreme Court expanded on this analysis in *United States* v. *Jacobsen* (1984) 466 U.S. 109 [80 L.Ed.2d 85, 104 S.Ct. 1652], which held that a chemical field test which discloses only whether or not the substance tested is cocaine is not a search. (*Id.*, at pp. 123-124 [80 L.Ed.2d at pp. 100-101].) "Congress has decided . . . to treat the interest in 'privately' possessing cocaine as illegitimate; thus governmental conduct that can reveal whether a substance is cocaine, and no other arguably 'private' fact, compromises no legitimate privacy interest." (*Id.*, at p. 123 [80 L.Ed.2d at pp. 100-101].) The court found this conclusion "dictated" by *Place* (*ibid.*): "[T]he *reason* [the canine sniff in *Place*] did not intrude upon any legitimate privacy interest was that the governmental conduct could reveal nothing about noncontraband items." (*Id.*, at p. 124, fn. 24 [80 L.Ed.2d at p. 101].)

However, if the police detain an object for the purpose of a sniff search, the detention is a "seizure" and must be justified as such. For example, a "*Terry*-type" investigatory detention of an object to be sniffed is permissible, if based on reasonable suspicion that the object contains contraband. (462

---

[4] Defendant's present contentions represent something of a variation on the theme he sounded below. Defendant did argue that his consent to search was limited to his baggage; however, he essentially conceded that Officer David could properly open the trunk to get at the baggage. The thrust of his argument was that Officer David should have made sure that Rycon did not sniff anything *other than* the baggage—for example, by removing the baggage from the trunk before the sniff search, by placing Rycon on a leash, or by searching the baggage himself.

U.S. at pp. 707-709 [77 L.Ed.2d at pp. 120-122]) Similarly, if the police conduct a canine sniff search in a private place, or in a manner which otherwise violates a reasonable expectation of privacy, the resulting intrusion is a search. (*Romo* v. *Champion* (10th Cir.1995) 46 F.3d 1013, 1016-1017, cert. den. __ U.S. __ [133 L.Ed.2d 309, 116 S.Ct. 387]; see also *U.S.* v. *Diaz* (6th Cir. 1994) 25 F.3d 392, 396 [canine "sniff" of defendant's car while parked in motel parking lot not a search; defendant had no reasonable expectation of privacy]; see generally, *Katz* v. *United States* (1967) 389 U.S. 347 [19 L.Ed.2d 576, 88 S.Ct. 507].)

■ There is a legitimate expectation of privacy in the interior of a car. (*Almeida-Sanchez* v. *United States* (1973) 413 U.S. 266, 269 [37 L.Ed.2d 596, 600-601, 93 S.Ct. 2535].) Opening the car trunk therefore constituted a search. Moreover, although the cocaine was found in the car rather than in the trunk, it is at least arguable that it was found as a result of the search of the trunk. Although as a legal matter, Officer David did not need consent to have Rycon sniff the exterior of the car, as a factual matter, he appears to have waited for consent from either defendant or Stewart before getting Rycon from his patrol car and conducting the sniff search. Certainly he never testified that he would have conducted a sniff search in the absence of consent. It was while Rycon was sniffing the trunk that he detected the scent of the cocaine inside the car. Thus, rather than rest our decision on this point, we assume, without deciding, that opening the trunk led to discovery of the cocaine.

■ "A consensual search may not legally exceed the scope of the consent supporting it. [Citation.]" (*People* v. *Crenshaw* (1992) 9 Cal.App.4th 1403, 1408 [12 Cal.Rptr.2d 172].) "The standard for measuring the scope of a suspect's consent under the Fourth Amendment is that of 'objective' reasonableness—what would the typical reasonable person have understood by the exchange between the officer and the suspect?" (*Florida* v. *Jimeno*, *supra*, 500 U.S. at p. 251 [114 L.Ed.2d at p. 302].) As defendant's baggage was in the trunk, his consent to search was meaningless unless it included consent to open the trunk. Once the trunk was open, Officer David did not "search" the trunk beyond what was in plain view. This was within the scope of defendant's consent.

■ Next, defendant contends that his consent to search, even if it extended to the trunk, did not extend to the use of a drug-sniffing dog. We disagree, for two reasons. First, we do not believe defendant's consent to the use of a dog was required. Once defendant gave Officer David consent to search his baggage, and thus, albeit implicitly, the trunk, a canine sniff search of the trunk did not invade any legitimate expectation of privacy.

Although the dog's sense of smell was keener than that of the human police officer, all it could reveal to police was the presence of hidden contraband. Under *Place* and *Jacobsen, supra,* defendant simply had no right to object to this.[5] (See *U.S.* v. *Gonzalez-Basulto* (5th Cir. 1990) 898 F.2d 1011, 1013 [during consent search of the inside of defendant's truck, drug-sniffing dogs detected cocaine in closed boxes; use of dogs did not exceed scope of consent because canine "sniff" "was not a 'search' within the meaning of the fourth amendment"].)[6] Because the police were in a place where they had a right to be, they had a right to use a drug-sniffing dog there. Thus, the trial court correctly characterized this as "a plain smell case."

Alternatively, however, even assuming defendant's consent had to expressly or implicitly authorize a canine sniff, we believe it did. This case is closely similar to *U.S.* v. *Perez* (9th Cir. 1994) 37 F.3d 510. There, police stopped the defendant's van because it was weaving. (*Id.,* at p. 513.) During the stop, the police obtained the defendant's consent to search the van. (*Id.,* at p. 516.) One of the officers had Mickey, the drug-sniffing dog, on standby (*id.,* at p. 513); Mickey found drugs in the van's undercarriage. (*Id.,* at p. 516.)

The defendant argued that his consent to search did not extend to use of the dog. The appellate court disagreed, for two reasons: First, a canine sniff search performed on the exterior of a vehicle is minimally intrusive; and second, the defendant did not object to use of the dog. (37 F.3d at p. 516.) " 'Failure to object to the continuation of a vehicle search after giving general consent to search "is properly considered as an indication that the search was within the scope of the initial consent." ' " (*Ibid.,* quoting *U.S.* v.

---

[5] Obviously, this is not a case in which the defendant says, "Yes, you can search, but only if you don't use a drug-sniffing dog." This seems analogous to saying, "Yes, you can search for item x, but only if you ignore other contraband in plain view." It limits the search beyond what the Fourth Amendment would otherwise permit. It is conceivable that if the police choose to go forward with a search despite such a proviso, express or implied, they may be held to it on a contract theory. (But see *New York* v. *Class* (1986) 475 U.S. 106, 114 [89 L.Ed.2d 81, 90, 106 S.Ct. 960] [". . . efforts to restrict access to an area do not generate a reasonable expectation of privacy where none would otherwise exist."].)

We need not decide this question. It suffices that we find that defendant's refusal of consent to search the car and his consent solely to a search of his baggage do not imply a proviso that the police may not use a drug-sniffing dog.

[6] We decline to follow *State* v. *McLeod* (Fla.Dist.Ct.App. 1995) 664 So.2d 983, cert. den. (1996) __ U.S. __ [133 L.Ed.2d 849, 116 S.Ct. 919], and *Dominguez* v. *State* (Fla.Dist.Ct.App. 1993) 616 So.2d 506, rev. den. .624 So.2d 268, which held that consent to search did not authorize use of a drug-sniffing dog, because we do not find these cases persuasive. *Dominguez* was decided without the benefit of the United State Supreme Court's subsequent holding in *Jacobsen* that there can be no legitimate expectation of privacy regarding the presence of contraband. In *McLeod,* the court seems to have held that the state waived the argument at trial. (664 So.2d at pp. 984-985.)

*Cannon* (9th Cir. 1994) 29 F.3d 472, 477, quoting *United States* v. *Sierra-Hernandez* (9th Cir. 1978) 581 F.2d 760, 764, cert. den., 439 U.S. 936 [58 L.Ed.2d 333, 99 S.Ct. 333].)

Here, defendant similarly did not object to use of the dog. Also, Officer David's patrol car was clearly marked "K-9." Thus, defendant had reason to know Officer David had a dog with him, and hence to expect that the search would be carried out with the assistance of a dog. (See *U.S.* v. *Gonzalez-Basulto, supra,* 898 F.2d at p. 1013 [use of drug-sniffing dog did not exceed scope of consent to search vehicle where dogs were present at the scene when the defendant gave consent and defendant "stood silent" when dogs were used]; *State* v. *Paredes* (1991) 167 Ariz. 609, 613 [810 P.2d 607] [use of drug-sniffing dog did not exceed scope of consent to search vehicle where ". . . the dog was present on the scene when the defendant's consent was given and the defendant did not revoke his consent when the dog was brought to the vehicle"].)

In *Dominguez* v. *State, supra,* 616 So.2d 506, on which defendant relies, the court emphasized that: "The present search was the search of a home. 'A private home, as here, is an area where a person enjoys the highest reasonable expectation of privacy under the Fourth Amendment . . . and . . . accordingly, the factors bearing on the voluntariness of a consent to search a home must be scrutinized with special care.' [Citation.]" (*Id.,* at p. 507.) It then relied on the fact that ". . . the officers were not accompanied by the drug detection dog when they obtained consent." (*Ibid.;* see also *State* v. *McLeod, supra,* 664 So.2d at p. 985 ["The Dominguez court pointedly stated that no dog was present when the consent was given, thereby implying that as a matter of law the consent given did not authorize the use of a dog."].) Neither of these factors is present here.

We conclude that the canine sniff did not exceed the scope of defendant's consent to search.

V, VI*

. . . . . . . . . . . . . . . . . . . . . . . . . . . .

---

*See footnote, *ante,* page 754.

## VII

### DISPOSITION

The judgment is affirmed.

McKinster, Acting P. J., and McDaniel, J.,* concurred.

Petitions for a rehearing were denied April 3, 1996, and appellant's petition for review by the Supreme Court was denied May 29, 1996.

---

*Retired Associate Justice of the Court of Appeal, Fourth District, sitting under assignment by the Chairperson of the Judicial Council.